IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:15-CT-3118-FL

| | | |
|---|---|---|
| THOMAS PATTEN, LESLIE TEACHEY, RYAN TURNER, BUDDHA VICTORIA, CHRIS YERRY, STUART GAIDOSH, DONNIE IVEY, SCOTT IVEY, T.J. LOCKLEAR, PHILLIP JARMAN, XAVIER MOORE, GARY PARKER, JAMEY LEE DOWLESS, BRYAN CRUMP, JR., JEREMY CLINE, DEXTER BROWN, JOSHUA BOYKIN, MARCELL ALSBROOK, STEVIE WILLIAMS, DONALD MORRISEY, PAUL BARTON, LEROY HUNT, CEDRIC WILLIAMS, ADEMAR MARTINEZ, and JOHNNY FAISON, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | ORDER |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAFAYETTE HALL, JEFFREY MARKS, ANTHONY JACKSON, DAVID JONES, KENNETH N. JONES, JR., HENRY OUTLAW, CLEMENT BURNEY, CHARLES HOLLAND, EUGENE MURPHY, RONNIE BRITT, WILLIAM M. WARD, and NELSON SANCHEZ, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants.[1] | ) | |

This matter is before the court on defendants' motion for summary judgment (DE 189),

plaintiffs' motion for sanctions (DE 179), and the parties' consent motions to seal (DE 184, 187)

certain filings. The motions for summary judgment and sanctions were fully briefed and in this

---

[1] The court dismissed previously-named defendants North Carolina Department of Public Safety, Frank L. Perry, Sergeant Wilson, and Officer Hudson by separate order entered April 20, 2016.

posture are ripe for decision. For the reasons that follow, the court grants defendants' motion for summary judgment, denies plaintiffs' motion for sanctions, and grants the motions to seal.

## STATEMENT OF THE CASE

On May 29, 2015, plaintiffs, current and former state prisoners acting through counsel, brought this action against Frank L. Perry ("Perry"), the North Carolina Department of Public Safety ("DPS"), Lafayette Hall ("Hall"), Jeffrey Marks ("Marks"), Anthony Jackson ("A. Jackson"), David Jones ("D. Jones"), Kenneth N. Jones Jr. ("K. Jones"), Sergeant Wilson ("Wilson"), Henry Outlaw ("Outlaw"), Clement Burney ("Burney"), Charles Holland ("Holland"), Officer Hudson ("Hudson"), Eugene Murphy ("Murphy"), Ronnie Britt ("Britt"), William M. Ward ("Ward"), and Nelson Sanchez ("Sanchez"), alleging claims for violations of their civil rights pursuant to 42 U.S.C. § 1983, and tort law claims under North Carolina law.

Plaintiffs Thomas Patten ("Patten"), Leslie Teachey ("Teachey"), Ryan Turner ("Turner"), Buddha Victoria ("Victoria"), Chris Yerry ("Yerry"), Stuart Gaidosh ("Gaidosh"), Donnie Ivey ("D. Ivey"), Scott Ivey ("S. Ivey"), T.J. Locklear ("Locklear"), Phillip Jarman ("Jarman"), Xavier Moore ("Moore"), Gary Parker ("Parker"), Jamey Lee Dowless ("Dowless"), Bryan Crump, Jr. ("Crump"), Jeremy Cline ("Cline"), Dexter Brown ("Brown"), Joshua Boykin ("Boykin"), Marcell Alsbrook ("Alsbrook"), Stevie Williams ("S. Williams"), Donald Morrisey ("Morrisey"), Paul Barton ("Barton"), Leroy Hunt ("Hunt"), Cedric Williams ("C. Williams"), Ademar Martinez ("Martinez"), and Johnny Faison ("Faison") are current or former North Carolina inmates who were incarcerated at the Sampson Correctional Institution ("Sampson C.I.") between 2011 and 2012. Plaintiffs were assigned to the "Road Squad" at the Sampson C.I. – an inmate work crew that performed landscaping and maintenance activities in the community. Plaintiffs allege that defendants A.

Jackson and D. Jones abused and humiliated them when they working on the Road Squad, and forced them to participate in a contraband smuggling operation.

On September 2, 2015, plaintiffs filed amended complaint and alleged the following claims: 1) violations of 18 U.S.C. § 1962(c) against defendants A. Jackson, D. Jones, Hudson, Murphy, Britt, Ward, and Sanchez; 2) constructive fraud against all defendants; 3) civil conspiracy against defendants A. Jackson, D. Jones, Hudson, Murphy, Britt, Ward, and Sanchez; 4) denial of access to the courts in violation of the First Amendment to the United States Constitution against defendants DPS and Perry; 5) intentional and negligent infliction of emotional distress against defendants A. Jackson, D. Jones, Hudson, Murphy, Britt, Ward, and Sanchez; 6) civil rights claims pursuant to 42 U.S.C. §§ 1983 and 1985, premised on violations of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, against defendants DPS, A. Jackson, D. Jones, Hudson, Murphy, Britt, Ward, Sanchez, K. Jones, Wilson, Outlaw, Burney, Holland, Hall, Marks, and Perry; 7) negligent employment and supervision against defendants DPS, K. Jones, Wilson, Outlaw, Burney, Holland, Hall, Marks, and Perry; 8) negligence by private contractors against unknown defendant medical contractors; and 9) punitive damages pursuant to 42 U.S.C. § 1983 against defendants A. Jackson and D. Jones in their individual capacities only. As relief, plaintiffs seek compensatory and punitive damages, and an injunction directing the State of North Carolina to provide sufficient funding to allow inmates meaningful access to the courts.

Defendants Hall, K. Jones, Wilson, Outlaw, Burney, Holland, Murphy, Britt, Ward, and Sanchez filed answer to plaintiffs' amended complaint on December 22, 2015. Defendant D. Jones, proceeding pro se, filed answer on December 23, 2015. Defendant A. Jackson did not respond to plaintiffs' amended complaint.

On April 20, 2016, the court granted plaintiffs' motion to voluntarily dismiss the action as to formerly-named defendants Perry and DPS, and the court dismissed the action as to formerly-named defendants Wilson and Hudson for failure to perfect service. On April 29, 2016, the court entered case management order governing discovery and pretrial motions practice. On June 3, 2016, the court entered default against defendant A. Jackson for failure to plead or otherwise defend.

Discovery in this action has been protracted and contentious. As relevant to the instant motions, on August 10, 2017, plaintiffs filed motion to compel responses to plaintiffs' written discovery requests. The court referred the motion to a magistrate judge. On December 7, 2017, the magistrate judge entered order granting in part and denying in part the motion to compel, and directed defendants Hall, K. Jones, Burney, Holland, Murphy, Britt, Ward, Marks and Sanchez (together, "responding defendants") to produce responses to certain of plaintiffs' written discovery requests by December 20, 2017.

The responding defendants did not produce their discovery responses by December 20, 2017, and thus plaintiffs filed their first motion for sanctions on December 29, 2017. The motion was fully briefed. On April 25, 2018, the court granted the motion for sanctions, imposed monetary sanctions, and reopened discovery for a period of four months (subsequently extended to five months on consent motion of the parties) to allow plaintiffs to obtain the necessary discovery.

On August 14, 2018, responding defendants filed notice of compliance with the court's April 25, 2018, order, noting that all responding defendants except defendant Marks had complied with the order. The notice explained defendant Marks failed to cooperate with counsel's efforts to obtain the discovery from him. The supplemental discovery period closed on September 30, 2018.

On October 18, 2018, plaintiffs filed the instant second motion for sanctions based on defendant Marks's failure to respond to the court's December 7, 2017, and April 25, 2018, orders directing him to respond to plaintiffs' discovery requests. Plaintiffs seek an array of sanctions, including entry of default judgment against defendant Marks. The motion was fully briefed.

On November 30, 2018, defendants Hall, Marks, K. Jones, Outlaw, Burney, Holland, Murphy, Britt, Ward and Sanchez (together, "moving defendants") filed the instant motion for summary judgment, relying on a memorandum of law, statement of material facts, and the following: 1) excerpts of depositions from defendants Holland, Burney, D. Jones, Outlaw, Marks, Hall, Britt, Murphy, Sanchez, K. Jones, Ward, and A. Jackson, plaintiffs Boykins, Jarman, Patten, D. Ivey, Dowless, and Parker, Rule 30(b)(6) witness Captain Robert Van Gorder ("Gorder"), the Sampson C.I. assistant superintendent of custody and operations, Alvin Keller ("Keller"), a DPS corrections officer, Rommie Barts ("Barts"), a DPS corrections officer, William Jackson ("W. Jackson"), a DPS corrections officer, Kathy Poole ("Poole"), a DPS administrator, and Emilio Pagan ("Pagan"), a DPS investigator; 2) declarations of Gorder, Karen R. Pardue ("Pardue"), a DPS correctional programs director, and Linda Clark ("Clark"), a DPS records coordinator; 3) complaint in <u>Parker et al. v. Sampson Corr. Inst.</u>, No. 1:12-CV-769-CCE-JEP (M.D.N.C. July 23, 2012); and 4) plaintiffs' initial disclosures.

Plaintiffs responded in opposition to the instant motion for summary judgment on March 21, 2019. In support, they rely upon a memorandum of law, statement of material facts, and the following: 1) full depositions from the same parties and witnesses filed in support of defendants' motion, with the exception of defendant Outlaw; 2) deposition from Eric Warren ("Warren"), a DPS employee in the information security office; 3) inmate grievance forms from plaintiffs Brown,

Dowless, D. Ivey, Jarman, Parker, Patten, Williams, and Yerry; 4) affidavits from plaintiffs Cline, Gaidosh, Faison, Locklear, and Williams; 5) records from defendant D. Jones's appeal of DPS's decision to terminate his employment ("Jones Appeal"); and 6) DPS Investigation Findings of Fact related to plaintiffs' claims.

On April 4, 2019, moving defendants filed reply in further support of their motion for summary judgment, supported by reply statement of material facts.

## STATEMENT OF THE FACTS

Where moving defendants move for summary judgment, the court recounts the facts in the light most favorable to plaintiffs.

The Sampson C.I. Road Squad is an inmate work crew that performs maintenance and landscaping services in the community surrounding the prison. (Patten Dep. (DE 202-18) at 19:12-16; A. Jackson Dep. (DE 202-9) at 9:17-23). Between 2011 and July 2012, defendants A. Jackson and D. Jones were the primary supervisors of the Road Squad. (A. Jackson Dep. (DE 202-9) at 9:2-7; D. Jones. Dep. (DE 202-12) at 42:6-24, 45:6-25; Ward Dep. (DE 202-22) at 14:13-19). As noted, plaintiffs allege defendants A. Jackson and D. Jones abused and humiliated them when they worked on the Road Squad, and forced them to participate in a contraband smuggling operation.

The alleged abuse started with an "initiation" ritual. (DPS Investigation Findings of Fact (DE 202-39) at 1).[2] When a new Sampson C.I. inmate joined the Road Squad, defendants A. Jackson and D. Jones told him to stick his fingers into a sandwich bag containing extremely spicy hot sauce and lick the hot sauce off his fingers. (Id.; Murphy Dep. (DE 202-16) at 28:5-29:15).

---

[2]     Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

Defendants A. Jackson and D. Jones's abuse of plaintiffs continued after this initiation ritual, and included physical, psychological, and emotional abuse, racial harassment, and forcing plaintiff to perform humiliating, embarrassing, and dangerous acts on each other and with animals. (Cline Aff. (DE 202-32) ¶ 7; Gaidosh Aff. (DE 202-33) ¶ 6; Faison Aff. (DE 202-34) ¶ 7). For example, plaintiffs reported defendants A. Jackson and D. Jones forced them to consume hot sauce, physically assault other inmates, allow other inmates to hold them down and squeeze their genitals, and rub hot sauce on their genitals or anus. (Cline Aff. (DE 202-33) ¶ 7; Gaidosh Aff. (DE 202-33) ¶ 6; Faison Aff. (DE 202-34) ¶ 7; Locklear Aff. (DE 202-35) ¶¶ 10-15; Williams Aff. (DE 202-36) ¶ 25; Jarman Dep. (DE 202-11) at 90:15-91:8).

Defendants A. Jackson and D. Jones also allegedly ran a contraband smuggling operation, primarily involving tobacco, illicit narcotics, and cellular telephones, and forced plaintiffs to participate. (Gaidosh Aff. (DE 202-33) ¶ 10; Patten Dep. (DE 202-18) at 32:10-11; Ivey Dep. (DE 202-8) at 47:2-10; Dowless Dep. (DE 202-5) at 37:15-38:7, 53:16-54:23; Jarman Dep. (DE 202-11) at 44:21-45:5; Parker Dep. (DE 202-17) at 100:5-21, 107:3-13). Some plaintiffs were forced to conceal contraband in their body cavities in order to smuggle it into the prison. (Gaidosh Aff. (DE 202-33) ¶ 10; Ivey Dep. (DE 202-8) at 47:2-10; Dowless Dep. (DE 202-5) at 37:15-38:7, 53:16-54:23; Jarman Dep. (DE 202-11) at 44:21-45:8; Parker Dep. (DE 202-17) at 100:5-21, 107:3-13). Plaintiffs Parker and Dowless testified that they transferred some of the profits they made from selling the contraband to defendants A. Jackson and D. Jones. (Parker Dep. (DE 202-17) at 100:5-21, 107:3-13; Dowless Dep. (DE 202-5) 52:3-21, 56:20-23). Defendants A. Jackson and D. Jones rewarded plaintiffs who cooperated with the contraband smuggling scheme and the inmate abuse,

including by permitting them to consume outside food and drinks, smoke cigarettes, and use cellular telephones. (Jarman Dep. (DE 202-11) at 69:11-19).

In January or February 2012, defendant Marks, the assistant superintendent at the Sampson C.I., received a report from an inmate that defendant A. Jackson instructed him to use a racial epithet towards another member of the Road Squad. (See Marks Dep. (DE 202-15) at 52:6-54:1, 62:8-63:1, 107:10-23). He informed defendant Hall, the superintendent of the Sampson C.I., about the allegation, and defendant Hall stated it was being investigated. (Id. at 53:6-21).[3]

In July 2012, DPS officials launched an investigation after plaintiff Dowless reported that defendants A. Jackson and D. Jones instructed white Road Squad inmates to hold black inmates down and torture them by grabbing their genitals, purchased contraband for Road Squad inmates, and engaged in other inappropriate behavior. (Internal Investigation Report (DE 191-27)). Approximately a week after learning about the allegations, Sampson C.I. officials removed defendants A. Jackson and D. Jones from the Road Squad pending the investigation. (Moving Defs' SOMF (DE 190) ¶ 172; Van Gorder Decl. (DE 191-25) ¶ 10; Internal Investigation Report (DE 191-27)). Defendant A. Jackson resigned from his DPS position in December 2012. (A. Jackson Dep. (DE 202-9) at 78:3). Following an investigation into the allegations, DPS terminated defendant D. Jones's employment. (Van Gorder Decl. (DE 191-25) ¶ 11).

The moving defendants did not generally supervise plaintiffs when they were working on the Road Squad. (Hall Dep. (DE 202-6) at 8:21-9:2, 10:10-11; Marks Dep. (DE 202-15) at 35:20-37:2; K. Jones Dep. (DE 202-13) at 59:7-19, 61:8-20, 62:10-13; Outlaw Dep. (DE 191-5) at 22:6-23, 23:11-14; Burney Dep. (DE 202-4) at 38:15-23, 32:16, 33:5, 38:21-23; Holland Dep. (DE 202-7)

---

[3]    Defendant Hall testified he did not learn about the allegations until July 2012, when he acted promptly to remove defendants A. Jackson and D. Jones from the Road Squad. (Hall Dep. (DE 202-6) at 15:15-17:7).

at 10:12, 11:9, 12:2-8, 17:10, 18:2, 46:21, 47:5; Murphy Dep. (DE 202-16) at 37:2-9; Britt Dep. (DE 202-3) at 17:1-6, 22:4-12; Ward Dep. (DE 202-22) at 10:20-23; Sanchez Dep. (DE 202-20) at 9:15-10:3). Plaintiffs, however, allege they were aware of the abuse and contraband smuggling operation described above, and failed to report it or otherwise protect plaintiffs from further abuse. In support of these claims, plaintiffs offer the following evidence.[4]

A.      Prisoner Abuse

Defendant Murphy, a Sampson C.I. corrections officer, trained with the Road Squad for approximately 40 hours in 2011 or 2012. (Murphy Dep. (DE 202-16) at 25:12-24). During that time, defendant Murphy observed members of the Road Squad taste defendant A. Jackson's hot sauce. (Id. at 28:5-30:22). Defendant Murphy explained that "I think probably my first day they talked about . . . anybody involved with the road squad . . . it was customary . . . to taste this hot sauce." (Id. at 28:5-8). Defendant Murphy further testified that defendant A. Jackson asked him to taste the hot sauce one day during their lunch break and he confirmed it was uncomfortably spicy. (Id. at 29:8:15). Defendant Murphy assumed defendant A. Jackson brought the hot sauce in his lunch bag. (Id. at 29:24-25). Finally, defendant Murphy witnessed defendant A. Jackson tell one inmate who was new to the Road Squad that all new members of the Road Squad needed to taste the hot sauce. (Id. at 30:5-13). He did not observe any other inmates taste the hot sauce during his time on the Road Squad. (Id. at 31:2-7). Barts, a Sampson C.I. corrections officer, also testified that he

---

[4]      The court draws the following factual summary from the evidence plaintiffs rely on in their amended memorandum opposing the instant motion for summary judgment, which they assert creates genuine issue of material facts precluding summary judgment. (See Pls' Am. Mem. (DE 203) at 4-5). The events summarized below all took place during the relevant time frame of early 2011 until July 2012, when defendants A. Jackson and D. Jones were removed from the Road Squad. Except as otherwise noted, the parties did not provide more specific dates for these events.

observed defendant Jackson with a glass bottle of hot sauce on the Road Squad bus, in violation of DPS policy. (Barts Dep. (DE 202-1) at 20:5-21:5).

Plaintiff Jarman testified that defendant Marks found the hot sauce on the bus on one occasion and asked defendant A. Jackson "is this what you use?" (Jarman Dep. (DE 202-11) at 54:18-20). Defendant A. Jackson then responded, "Yeah, that's it." (Id.). Plaintiff D. Ivey testified that he observed defendant Marks holding the hot sauce on the bus. (D. Ivey Dep. (DE 202-8) at 61:17-62:1).

B.    Contraband Smuggling

Defendant Ward, a Sampson C.I. corrections officer, testified that he found contraband on the Road Squad bus, including cigarette lighters, tobacco, and ashtrays, and that inmates often attempted to conceal this contraband in rubber gloves hidden in the seats. (Ward Dep. (DE 202-22) at 15:14-16:4)). Defendant Ward also searched inmates when they returned from the Road Squad. (Id. at 21:10-16). On various occasions, defendant Ward found cigarettes, bags of tobacco, cell phone chargers, condoms and money that Road Squad inmates were attempting to smuggle into the Sampson C.I. (Id.). He also recalled that he discovered "a lot more contraband" on inmates between 2011 and 2012 . (Id. at 22:17-25).

Defendant Britt, a Sampson C.I. corrections officer, observed inmates smoking on a bus that transferred some members of the Road Squad to other work assignments or back to the Sampson C.I. (Britt Dep. (DE 202-3) at 102:16-103:16).

W. Jackson, a Sampson C.I. lieutenant, was personally aware of three incidents when Road Squad inmates attempted to bring contraband into the prison in a hollowed-out cooler. (W. Jackson Dep. (DE 202-10) at 23:6-24:17). However, DPS officials did not charge the Road Squad inmates

or defendants A. Jackson and D. Jones with possession of contraband because the contraband was not found on them personally. (Id. at 23:22-24:7). W. Jackson also testified that DPS did not investigate whether any of the Road Squad corrections officers were responsible for modifying the coolers, because he believed the inmates were responsible. (Id. at 25:24-26:23). Although DPS officials questioned the inmates, none of them claimed responsibility for modifying the coolers, and DPS did not conduct further investigation. (Id. at 26:24-27:12).

Poole, a DPS administrator who completed the internal DPS investigation about the Road Squad, also testified concerning one incident in which a large amount of contraband was found coming into the Sampson C.I. from the Road Squad. (Poole Dep. (DE 202-19) at 63:25-64:6). The tobacco was in a cooler that had been on the Road Squad bus, and plaintiff Locklear was holding the cooler before officials searched it and discovered the contraband. (Id. at 64:10-19). The investigating officer initiated a disciplinary report, but defendant K. Jones decided not to proceed with formal disciplinary charges against plaintiff Locklear. (Id.; see also id. at 66:17-67:17). The initial disciplinary report has been lost, and defendant K. Jones may have destroyed it after he decided not to pursue formal charges against plaintiff Locklear. (See id. at 66:17-67:17).

Plaintiff Jarman testified that he believed defendant Ward allowed him to smuggle contraband into the Sampson C.I. because he was friends with plaintiff A. Jackson. (Jarman Dep. (DE 202-11) at 49:19-24). Defendant Ward searched plaintiff Jarman on at least one occasion when he had contraband after returning from the Road Squad and did not find it. (See id.). Another DPS corrections officer searched plaintiff Jarman on two occasions when he was concealing contraband on his person (but not in a body cavity) and did not find it. (Id. at 53:3-24). Plaintiff Jarman also testified that he believed defendant Ward and another DPS corrections officer were not randomly

assigned to search him when he returned from working on the Road Squad, in order to facilitate the contraband smuggling operation. (Id. at 48:20-49:24). However, plaintiff Jarman also testified that, corrections officers "rotated out" and "there was no real rhyme or reason" to how Sampson C.I. officials assigned officers to conduct strip searches of Road Squad inmates. (Id. at 51:14-19).

Plaintiff Parker successfully transported contraband he received while working on the Road Squad into the Sampson C.I., noting that he smuggled contraband into the prison almost every day. (Parker Dep. (DE 202-17) at 60:14-17; 109:23-110:21). According to plaintiff Parker, Sampson C.I. corrections officers did not perform proper body cavity searches when the plaintiffs returned from their work on the Road Squad. (Id.). Plaintiff Parker also testified that at times he was not searched at all. (Id. 73:17-19). Plaintiff Patten testified similarly. (Patten Dep. (DE 202-18) at 56:17-57:6). Defendant D. Jones reported that he informed his supervisors that some Road Squad inmates had cellular telephones and other contraband while they were performing work outside the prison, but the "supervisors did not seem bothered by it." (Jones Appeal (DE 202-37)).

C.      Miscellaneous Evidence

When conducting her investigation, Poole also determined that defendant Hall, the Sampson C.I. superintendent, had not followed DPS policy and procedure because he had failed to check the Road Squad at least once a month. (Poole Dep. (DE 202-19) at 71:11-72:2). Poole believes some of the alleged incidents that took place on the Road Squad could have been avoided if defendant Hall and others had properly completed their inspections of the Road Squad. (Id. at 72:3-73:1).[5]

---

[5]      By contrast, plaintiff D. Ivey, defendant A. Jackson, and W. Jackson testified that Sampson C.I. supervisors regularly inspected the Road Squad's activities when they were outside the prison. (See, e.g., A. Jackson Dep. (DE 202-9) at 25:2-26:5; D. Ivey Dep. (DE 202-8) at 61:1-12; W. Jackson Dep. (DE 202-10) at 72:20-72:39).

On at least one occasion, plaintiff Jarman overhead defendant A. Jackson tell defendants Outlaw, Wilson, and Burney, that he was taking out his "slaves" on the Road Squad. (Jarman Dep. (DE 202-11) at 57:1-10).

## DISCUSSION

A.     Motion for Summary Judgment

1.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor."

Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

2.      Plaintiffs Concede Summary Judgment as to Certain Claims

Plaintiffs do not oppose moving defendants' motion for summary judgment as to the following claims: 1) RICO violations pursuant to 18 U.S.C. § 1962(c) (first claim); 2) denial of access to the courts (fourth claim), 3) negligent infliction of emotional distress (part of the fifth claim); 4) First Amendment and 42 U.S.C. § 1985 violations (part of the sixth claim); 5) all official capacity claims against defendants Hall and Marks; and 7) negligent employment and supervision (seventh claim). (Pls' Am. Mem. (DE 203) at 2). Plaintiffs also did not respond to moving defendants' argument that the eighth claim, which is alleged against John Doe defendants that plaintiffs never identified, should be dismissed. (See generally Pls' Am. Mem. (DE 203)).

Accordingly, finding no genuine issue of fact as to these claims, the court grants moving defendants' motion as to these claims.

The remaining claims in this action are the following: 1) constructive fraud under North Carolina law (second claim); 2) civil conspiracy (third claim); 3) intentional infliction of emotional distress (part of the fifth claim); 4) 42 U.S.C. § 1983 claims premised on violations of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution (part of the sixth claim); and 5) punitive damages under North Carolina law (ninth claim).[6] (See Am. Compl. (DE 45)).

3.     Statute of Limitations

The court begins with moving defendants' arguments that plaintiffs Martinez, S. Ivey, Locklear, Turner, Barton, Cline, Gaidosh, Alsbrook, Faison, Hunt, Moore, Morrisey, S. Williams, and Teachey's (together, "limitations plaintiffs") constitutional claims are time barred. There is no federal statute of limitations for actions brought pursuant to 42 U.S.C. § 1983. Instead, the analogous state statute of limitations applies. Burnett v. Grattan, 468 U.S. 42, 49 (1984). Specifically, the state statute of limitations for personal injury actions governs claims brought under 42 U.S.C. § 1983. See Wallace v. Kato, 549 U.S. 384, 387-88 (2007). North Carolina has a three-year statute of limitations for personal injury actions. N.C. Gen. Stat. § 1-52(5); see Tommy Davis Const., Inc. v. Cape Fear Pub. Util. Auth., 807 F.3d 62, 67 (4th Cir. 2015).

Although the limitations period for claims brought under § 1983 is borrowed from state law, the time for accrual of an action is a question of federal law. Wallace, 549 U.S. at 388; Brooks v. City of Winston-Salem, N.C., 85 F.3d 178, 181 (4th Cir. 1996). A claim generally accrues when

---

[6]     Plaintiffs bring the punitive damages claim against defendants A. Jackson and D. Jones, who did not move for summary judgment. (See Am. Compl. (DE 45) ¶¶ 176-77). Accordingly, the court does not address the punitive damages claim herein.

the plaintiff knows or has reason to know of the injury which is the basis of the action.  See Wallace, 549 U.S. at 391.  However, when "a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation."  See DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018); Nat'l Advert. Co. v. City of Raleigh, 947 F.2d 1158, 1166-67 (4th Cir. 1991).  In order to rely on the "continuing violations" doctrine, plaintiffs must "(1) identify a series of acts or omission that demonstrate [the constitutional violation]; and (2) place one or more of these acts or omissions within the applicable statute of limitations."  DePaola, 884 F.3d at 487; see also Shomo v. City of N.Y., 579 F.3d 176, 182 (2d Cir. 2009).

Plaintiffs filed this action on May 29, 2015, and thus any claims that accrued prior to May 29, 2012 are presumptively untimely under North Carolina law.  See N.C. Gen. Stat. § 1-52(5); Tommy Davis Const., 807 F.3d at 67.  Here, the limitations plaintiffs do not dispute that they stopped working on the Road Squad prior to May 29, 2012.  (See Moving Defs' SOMF (DE 190) ¶ 38; Pls' SOMF (DE 199) ¶ 38).  Thus, under the traditional accrual rule, the limitations plaintiffs knew or should have known about the abuse and contraband smuggling operation before May 29, 2012, and their claims are untimely.  See Wallace, 549 U.S. at 391; N.C. Gen. Stat. § 1-52(5); Tommy Davis Const., 807 F.3d at 67.  The limitations plaintiffs therefore concede that, absent application of the continuing violations doctrine or equitable tolling, their § 1983 claims are time barred.  (Pls' Am. Mem. (DE 203-6) at 8, 11).

The limitations plaintiffs do not forecast evidence establishing a genuine issue of material fact with respect to the continuing violations doctrine.  As set forth above, to rely on the continuing violations doctrine, plaintiffs must "place one or more of the acts or omissions" giving rise to the

claims "within the statute of limitations periods." DePaola, 884 F.3d at 487. Although the limitations plaintiffs rely on various portions of the record that allegedly support their continuing violations theory, such evidence fails to establish that any of them suffered the abuse described in the amended complaint after May 29, 2012. (See Pls' Am. Mem (DE 203) at 12; Murphy Dep. (DE 202-16) at 28:5-30:22; Jarman Dep. (DE 202-11) at 54:18-20; D. Ivey Dep. (DE 202-8) at 61:20-62:1; K. Jones Dep. (DE 202-13) at 64:1-4; D. Jones Dep. (DE 202-12) at 61:6-18; Ward Dep. (DE 202-22) at 15:19-16:4; Britt Dep. (DE 202-3) at 102:13-103:16; Cline Aff. (DE 202-32) ¶¶ 10-11; Gaidosh Aff. (DE 202-33) ¶ 13; D. Jones Appeal (DE 202-37)).

The limitations plaintiffs also assert they are entitled to equitable tolling of the statute of limitations where they filed administrative grievances about the abuse that were pending during the applicable limitations period. The United States Court of Appeals for the Fourth Circuit has held that an inmate's attempts to exhaust administrative remedies under the Prison Litigation Reform Act tolls the statute of limitations applicable to the claims. See Battle v. Ledford, 912 F.3d 708, 719-20 (4th Cir. 2019).

The limitations plaintiffs, however, offer no evidence that they filed any administrative grievances that were not resolved prior to May 29, 2012. Of the limitations plaintiffs, only plaintiff Cline testified that he filed administrative grievances about unspecified "conditions" on the Road Squad. However, the affidavit does not provide the dates of the grievances or attach any documentation supporting his conclusory assertion that he filed the grievances. The limitations plaintiffs therefore have failed to satisfy their burden that administrative grievances tolled the limitations period. See Battle, 912 F.3d at 712 & n.2 (applying equitable tolling where plaintiff submitted verified evidence that he filed grievances that were pending during the limitations period);

Olson v. Mobil Corp., 904 F.2d 198, 203 (4th Cir. 1990) (party asserting equitable tolling has the burden of proving it).

Finally, plaintiffs generally argue equitable tolling should apply on the facts of this case because plaintiffs were prisoners subjected to severe abuse, and defendants have been on notice of their potential lawsuit since at least 2012. As a general matter, "a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005); see also Holland v. Florida, 560 U.S. 631, 653 (2010). The rule in North Carolina is similar. See Lewis v. N.C. State Highway & Pub. Wks. Comm'n, 228 N.C. 618, 620 (1948). The limitations plaintiffs have not shown that they were pursuing their rights diligently or that extraordinary circumstances prevented them from filing this action within the limitations period. To the extent the limitations plaintiffs allege they failed to file timely claims because they were fearful that defendants A. Jackson or D. Jones would abuse them further, the claim lacks merit. The majority of the limitations plaintiffs were transferred out of the Sampson C.I. within the limitations period, and thus they cannot claim that their fear of defendants A. Jackson or D. Jones prevented them from filing this action on a timely basis. (See Moving Defs' SOMF ¶ 3).

Moving defendants argue the state law claims are subject to a three-year statue of limitations, and that similar accrual rules apply to these claims. (Moving Defs' Mem. (DE 192) at 4-5); see also N.C. Gen. Stat. § 1-52(5). The limitations plaintiffs do not contest defendants' argument that if the limitations plaintiffs' § 1983 claims are untimely, the state law causes of action also are untimely.

The court therefore finds that the limitations plaintiffs' – plaintiffs Martinez, S. Ivey, Locklear, Turner, Barton, Cline, Gaidosh, Alsbrook, Faison, Hunt, Moore, Morrisey, S. Williams,

and Teachey – claims are time barred, and grants defendants' motion for summary judgment with respect to these plaintiffs' remaining claims.

Moving defendants do not contest that the continuing violations doctrine applies to (and renders timely) the claims of plaintiffs Patten, Parker, Jarman, Dowless, Brown, D. Ivey, C. Williams, Boykin, Crump, Victoria, and Yerry. (See Moving Defs' Mem. (DE 203) at 7-8). Accordingly, the court proceeds to analyze the merits of these plaintiffs' claims.

    4.      Merits

        a.      42 U.S.C. §§ 1983 claims

As noted, plaintiffs bring claims for violations of their civil rights under the Fifth, Eighth, and Fourteenth amendments to the United States Constitution against all moving defendants.

As to these claims, moving defendants assert the defense of qualified immunity. Government officials are entitled to qualified immunity from civil damages so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when 1) the plaintiff has not demonstrated a violation of a constitutional right, or 2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The court may proceed directly to the clearly established prong without first resolving whether the plaintiff has established a constitutional violation. Id.

The court begins with plaintiffs' Eighth Amendment claims. The Eighth Amendment protects inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. Under the Eighth Amendment, prison officials have a duty "to protect prisoners from violence at the hands of other

prisoners [or corrections staff]." <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994) (quotation omitted); <u>see</u> <u>Hudson v. Palmer</u>, 468 U.S. 517, 526–27 (1984); <u>Danser v. Stansberry</u>, 772 F.3d 340, 346 (4th Cir. 2014). To establish an Eighth Amendment violation premised on a failure to protect theory, plaintiffs must show that 1) they were incarcerated under conditions posing a substantial risk of harm, and 2) that moving defendants were deliberately indifferent to the risk of harm. <u>See</u> <u>Farmer</u>, 511 U.S. at 834, 837–38; <u>Danser</u>, 772 F.3d at 347. The deliberate indifference prong requires a showing that defendants knew of disregarded an excessive risk to inmate health or safety. <u>Farmer</u>, 511 U.S. at 837-38; <u>Danser</u>, 772 F.3d at 347.

The subjective knowledge requirement can be proven through circumstantial evidence showing that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." <u>Farmer</u>, 511 U.S. at 842 (quotation omitted); <u>Makdessi v. Fields</u>, 789 F.3d 126, 133 (4th Cir. 2013). Prison officials, however, can rebut the charge of actual knowledge by showing "that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent" or by showing they "responded reasonably" to the risk. <u>Farmer</u>, 511 U.S. at 844; <u>Makdessi</u>, 789 F.3d at 134.

Defendants do not dispute that the evidence presented by plaintiffs shows a genuine issue of material fact with respect to the first element of the claim – that they were incarcerated under conditions posing a serious risk of harm. Moving defendants, however, argue the undisputed record evidence does not establish that they were deliberately indifferent to the risk. Plaintiffs respond that "it is disputed that in multiple instances moving defendants saw the hot sauce on the bus, observed

forced hot sauce initiation rituals on Plaintiffs, saw smoking on the Road Squad bus, as well as surgical gloves" and that such evidence establishes a genuine issue of material fact with respect to the deliberate indifference prong. (Pls' Am. Mem. (DE 203) at 18-19).

The record evidence plaintiffs rely on, however, does not support these assertions. As plaintiffs emphasize, defendant Murphy observed defendant A. Jackson give hot sauce to Road Squad inmates, and testified he understood that all new Road Squad inmates were instructed to taste the hot sauce. (Murphy Dep. (DE 202-16) at 28:5-30:22). But he did not testify that any of the inmates felt "compelled" to try the hot sauce, and he never personally observed defendants A. Jackson and D. Jones forcing plaintiffs to eat the hot sauce, threatening plaintiffs in any manner, or engaging in any of the other abuse of Road Squad inmates. (See id. at 28:5-32:6, 71:1-72:1). This evidence does not establish defendant Murphy knew of and disregarded the abuse alleged in the amended complaint. See Farmer, 511 U.S. at 837-38, 842 (plaintiffs must demonstrate defendants knew of and disregarded a substantial risk of serious harm to establish deliberate indifference); Makdessi, 789 F.3d at 133 (same).

Plaintiff Jarman testified defendant Marks was on the Road Squad bus on one occasion, and he picked up the hot sauce and asked defendant A. Jackson, "is this what you use?" (Jarman Dep. (DE 202-11) at 54:18-20). Defendant A. Jackson then responded, "Yeah, that's it." (Id.). Plaintiff D. Ivey testified that he observed defendant Marks holding the hot sauce on the bus. (D. Ivey Dep. (DE 202-8) at 61:17-62:1). This testimony does not establish defendant Marks knew of and disregarded a substantial risk of serious harm to plaintiffs. In the absence of evidence showing

defendant Marks knew defendant A. Jackson used the hot sauce to abuse inmates,[7] the fact that he asked defendant A. Jackson if he used hot sauce on one occasion cannot support a reasonable inference that he was deliberately indifferent to a risk to plaintiffs' safety.  See Evans Techs. Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996) (explaining "unsubstantiated allegations and bald assertions" cannot defeat a motion for summary judgment); Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, 53 F.3d 55, 62 (4th Cir. 1995) ("The building of one inference upon another will not create a genuine issue of material fact.  Mere unsupported speculation . . . is not enough to defeat a summary judgment motion.").

The court has carefully reviewed and considered the remainder of the evidence plaintiffs offer in support of their assertion that moving defendants knew of and consciously disregarded a serious risk to plaintiffs' health or safety.  (See K. Jones Dep. (DE 202-13) at 64:1-4; D. Jones Dep. (DE 202-12) at 61:6-18; Ward Dep. (DE 202-22) at 15:19-16:4; Britt Dep. (DE 202-3) at 102:13-103:16).  The evidence at most establishes defendants K. Jones, Ward, and Britt were aware that contraband had been smuggled into the Sampson C.I. through the Road Squad.  Such evidence does not permit the reasonable inference that moving defendants were aware of the alleged abuse or that defendants A. Jackson or D. Jones were forcing inmates to smuggle contraband into the prison.[8]

---

[7]    As discussed further below, defendant Marks testified at deposition that he received reports of inmates being forced to use racial epithets while on the Road Squad in early 2012.  (Marks Dep. (DE 202-15) at 52:6-54:1, 62:8-63:1, 107:10-23).  This evidence does not show defendant Marks was aware that defendant A. Jackson was using the hot sauce to abuse prisoners at the time he asked defendant A. Jackson if he "used" the hot sauce.

[8]    The court addresses plaintiffs' claim that moving defendants were aware of the contraband smuggling operation in further detail below.

In sum, plaintiffs have not established a genuine issue of material fact with respect to their claim that moving defendants were deliberately indifferent to a serious risk to plaintiffs' health or safety in violation of Eighth Amendment.

The court now turns to plaintiffs' Fourteenth Amendment claim, which is premised on violations of plaintiffs' right to equal protection. The Equal Protection Clause provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To that end, the Equal Protection Clause provides that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Generally, in order to establish an equal protection claim, a plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. If a plaintiff makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Veney v. Wyche, 293 F.3d 726, 730–31 (4th Cir. 2002) (internal quotation omitted); Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001).

Plaintiffs offer no evidence to support an equal protection claim against the moving defendants. To survive a motion for summary judgment on this claim, plaintiffs must establish that moving defendants were personally involved in the alleged racial discrimination. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). As discussed at length above (and further below), plaintiffs have not established that moving defendants were aware of the alleged abuse that took place on the Road Squad.

Plaintiffs note that they heard defendant A. Jackson refer to them as "slaves" in a conversation with defendants Burney and Outlaw. (Pls' Am. Mem. (DE 207) at 9). Defendant A. Jackson's comment, while repulsive and unprofessional, does not establish defendants Burney or Outlaw themselves subjected defendants to unequal treatment based on their race. See Carter v. Morris, 164 F.3d 215, 219 n.3 (4th Cir. 1999) (explaining that officers' alleged used of racial epithets standing alone did not violate plaintiff's constitutional rights); see also Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999) ("We hold today that an officer's use of a racial epithet without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation"). Accordingly, defendants are entitled to judgment as a matter of law on plaintiffs' equal protection claim.

Turning to the Fifth Amendment claim, plaintiffs allege that moving defendants violated their privilege against self-incrimination by forcing them to smuggle contraband into the Sampson C.I. and subjecting them to abuse if they refused to comply. Plaintiffs allege that if they reported the Road Squad abuse or smuggling to prison officials, they would be "forced" to incriminate themselves for smuggling contraband into the prison. (Pls' Am. Mem (DE 203) at 17-18).

The Self-Incrimination Clause of the Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Inmates do not lose their Fifth Amendment privilege against self-incrimination solely by virtue of their criminal conviction or their status as prisoners. See McKune v. Lile, 536 U.S. 24, 35-37 (2002); Taylor v. Best, 746 F.2d 220, 222 (4th Cir. 1984). To establish a violation of the Self-Incrimination clause, plaintiffs must produce evidence that they were "compelled" to incriminate themselves by defendants. See McKune, 536 U.S. at 35-37.

Assuming without deciding that the allegations against D. Jones and A. Jackson may implicate plaintiffs' privilege against self-incrimination, plaintiffs offer no evidence that moving defendants themselves violated the privilege. As set forth above, the evidence does not support a finding that moving defendants were responsible for the abuse on the Road Squad, or the contraband smuggling operation. Accordingly, moving defendants could not have participated in any alleged "compelled" self-incrimination under the theory espoused by plaintiffs. See McKune, 536 U.S. at 35 (prisoner alleging violation of Fifth Amendment Self-Incrimination Clause must establish that defendants compelled him to incriminate himself); see also Taylor, 746 F.2d at 222-24.

Furthermore, as moving defendants note, plaintiffs were not charged with any criminal offenses or other disciplinary violations after the Road Squad allegations became public, and plaintiffs offer no evidence that moving defendants compelled them to incriminate themselves prior to that time. (See Pls' Am Mem. (DE 203) at 17-18); Burrell v. Virginia, 395 F.3d 508, 514 (4th Cir. 2005). Defendants are therefore entitled to judgment as a matter of law on plaintiffs' Fifth Amendment claim.

In sum, the court finds the record evidence relied on by plaintiffs does not establish moving defendants violated plaintiffs' constitutional rights under the Fifth, Eighth, or Fourteenth Amendments, and thus moving defendants are entitled to qualified immunity. Accordingly, the court grants moving defendants' motion for summary judgment as to plaintiffs' § 1983 claims premised on direct constitutional violations.

        b.        Bystander and Supervisory Liability

Plaintiffs also assert that moving defendants are liable for the alleged constitutional violations committed by defendants A. Jackson and D. Jones based on theories of bystander or

supervisory liability. "An officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Randall v. Prince George's Cnty., Md., 302 F.3d 188, 203-04 (4th Cir. 2002); see also Stevenson v. Seat Pleasant, Md., 743 F.3d 411, 416-17 (4th Cir. 2014). A claim for supervisory liability requires allegations showing: (1) "the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury"; (2) the supervisor responded so inadequately "as to show deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) "there was an affirmative causal link" between the supervisor's inaction and plaintiff's alleged injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (quotations omitted).

The court's analysis of plaintiffs' Eighth Amendment failure to protect claim, and its finding that the record evidence submitted in support thereof does not establish moving defendants were aware of the Road Squad abuse and contraband smuggling operation also applies to this claim. Plaintiffs' Eighth Amendment, bystander and supervisory liability claims all require evidence showing that moving defendants had actual or constructive knowledge of the Road Squad abuse or contraband smuggling. See Farmer, 511 U.S. at 833 (Eighth Amendment failure to protect); Randall, 302 F.3d at 203-04 (bystander liability); Shaw, 13 F.3d at 799 (supervisory liability). Accordingly, to the extent plaintiffs rely on the same evidence discussed above in connection with the Eighth Amendment failure to protect theory, the court disagrees that such evidence establishes moving defendants' actual or constructive knowledge of the alleged constitutional violations for the reasons set forth above. The court addresses below the additional evidence plaintiffs rely on to support their bystander or supervisory liability theories.

Plaintiffs ask the court to infer that because some inmates successfully transported contraband into the Sampson C.I. the moving defendants were part of the smuggling operation and the abuse on the Road Squad. But there is no evidence to support this assertion. Plaintiff Jarman, for example, testified he "believed" defendant Ward allowed him to smuggle contraband into the Sampson C.I. because he was friends with defendant A. Jackson. (Jarman Dep. (DE 202-11) at 49:19-24). But plaintiff Jarman also testified that Sampson C.I. corrections officers "rotated out" and "there was no real rhyme or reason" to which officers (some of whom were not defendants) searched him on any particular day when he returned from the Road Squad work detail. (Id. at 51:14-19). This testimony supports the opposite inference from what plaintiffs ask the court to draw – if the officers were randomly assigned to search plaintiff Jarman when he returned from the Road Squad, the court cannot infer that moving defendants were involved in contraband smuggling based solely on plaintiff Jarman's unsupported speculation. See Ennis, 53 F.3d at 62. Furthermore, the fact that unidentified corrections officers failed to perform searches of plaintiffs when they returned from the Road Squad, (see Parker Dep. (DE 202-17) at 73:17-74:3; Patten Dep. (DE 202-18) at 56:17-57-6), does not support an inference that moving defendants were aware of the contraband smuggling operation.

Plaintiffs also emphasize that when contraband was found on the Road Squad bus, the incidents were not investigated and the inmates involved were not punished. (See Pls' Am. Mem. (DE 203) at 14 (citing D. Ivey Dep. (202-8) at 50:13-20, 51:21-55:11; W. Jackson Dep. (DE 202-10) at 20:8-20, 23:6-24:17, 25:24-26:11; A. Jackson Dep. (DE 202-9) at 47:9-48:15, 32:18-33:8; Jones Appeal (DE 202-37); Ward Dep. (DE 202-22) at 15:8-16:4; Britt Dep. (DE 202-3) at 102:13-103:16; Murphy Dep. (DE 202-16) at 28:5-30:22; Poole Dep. (DE 202-19) at 34:5-18)). W. Jackson indeed

testified that he recalled three incidents in which tobacco was found on the Road Squad bus, but inmates were not charged and the incidents were not thoroughly investigated because he could not determine which of the seven inmates possessed the contraband.[9] (W. Jackson Dep. (DE 202-9) at 23:6-24:17, 25:24-26:11). Defendant D. Jones also reported that he informed his supervisors that some Road Squad inmates had cellular telephones and other contraband while they were performing work outside the prison, but the "supervisors did not seem bothered by it." (Jones Appeal (DE 202-37)). Finally, as noted above, defendant K. Jones did not issue formal disciplinary charges against plaintiff Locklear after contraband was found in a Road Squad cooler. (Poole Dep. (DE 202-19) at 63:25-67:17). Defendant K. Jones also may have destroyed the initial investigation report. (See id.).

This evidence does not support a reasonable inference that the <u>moving defendants</u> were aware of the abuse alleged in the amended complaint or that defendants A. Jackson or D. Jones forced plaintiffs to smuggle contraband into the Sampson C.I. The only reasonable inference the court can draw from this evidence is that members of the Road Squad were smuggling contraband into the Sampson C.I. and prison officials failed to properly investigate it, which does not establish the requisite knowledge of prisoner abuse on the part of moving defendants to support bystander or supervisory liability.[10] See <u>Randall</u>, 302 F.3d at 205 (plaintiffs failed to establish defendants were aware of constitutional violation under bystander liability theory where claim relied on "mere inference" from complex circumstances that defendants knew of constitutional violations); <u>Shaw</u>,

_____

[9] W. Jackson noted that he would not expect the inmates to confess to smuggling contraband. (W. Jackson Dep. (DE 202-9) at 23:6-24:17, 25:24-26:11).

[10] The court has reviewed and considered the remainder of the record evidence plaintiffs rely on as support for the theory that moving defendants were aware that defendants A. Jackson and D. Jones were forcing inmates to smuggle contraband into the Sampson C.I. The evidence cited does not support that inference. (See D. Ivey Dep. (202-8) at 50:13-20, 51:21-55:11; A. Jackson Dep. (DE 202-9) at 47:9-48:15, 32:18-33:8; Ward Dep. (DE 202-22, at 15:8-16:4; Britt Dep. (DE 202-3) at 102:13-103:16; Murphy Dep. (DE 202-16) at 28:5-30:22; Poole Dep. (DE 202-19) at 34:5-18).

13 F.3d at 799 (supervisory liability requires showing of pervasive or unreasonable risk of harm); Ennis, 53 F.3d at 62 (speculative evidence cannot defeat motion for summary judgment).

Plaintiffs also rely on testimony from defendant Marks and plaintiff Cline to support their claim that defendants knew about the Road Squad abuse and contraband smuggling prior to July 2012. (Pls' Am. Mem. (DE 203) at 14-15). For example, defendant Marks testified at deposition that an inmate reported to him in January or February 2012 that defendant A. Jackson forced him to use racial epithets directed to other members of the Road Squad. (Marks Dep. (DE 202-15) at 52:6-54:1, 62:8-63:1, 107:10-23).[11] Plaintiff Cline submitted affidavit testimony stating that he "complained about the conditions to the Road Squad" by filing three administrative grievance, and defendant Holland responded to the grievances by stating the allegations were being investigated. (Cline Aff. (DE 202-32) ¶ 10).

Defendant Marks' testimony that an inmate reported he was forced to use a racial epithet does not establish defendant Marks knew about the constitutional violations alleged in the amended complaint. (Marks Dep. (DE 202-15) at 52:6-53:21, 62:8-63:1, 107:10-23). As noted, an isolated incident of using a racial epithet does not rise to the level of a constitutional violation. See Carter, 164 F.3d at 219 n.3. Therefore, this evidence does not establish a claim for bystander or supervisory liability. See Stevenson, 743 F.3d at 416-17 (bystander liability requires that officer "knew that a fellow officer was violating an individual's constitutional rights" (alterations omitted)); Slakan v. Porter, 737 F.2d 368, 373 (4th Cir. 1984) (explaining supervisor's "continued inaction in the face of documented widespread abuses" is necessary to support a claim for supervisory liability). As to

---

[11] Defendant Marks suffers from health problems affecting his memory. (See Marks Aff. (DE 183-3) ¶ 17). The investigative report he produced regarding the Road Squad allegations indicates that he first learned about the allegations in July 2012. (DE 191-27).

plaintiff Cline's affidavit, he testified only that he complained about unspecified "conditions" on the Road Squad to defendant Holland, which does not establish defendant Holland was aware of the abuse or contraband smuggling alleged in the amended complaint and failed to protect plaintiff Cline from it.[12]

Finally, plaintiffs argue that some moving defendants traveled to the Road Squad's work location to observe defendants A. Jackson and D. Jones, and thus there is a disputed issue of fact with respect to what they observed on those occasions. (Pls' Am. Mem. (DE 203) at 15 (citing A. Jackson Dep. (DE 202-9); Burney Dep. (DE 202-4) at 54:13-15; D. Ivey Dep. (DE 202-8) at 61:1-14; Poole Dep. (DE 202-19) at 68:16-69:1; Outlaw Dep. (DE 191-5) at 23:11-14)). In the absence of affirmative evidence (such as plaintiffs' direct testimony) that moving defendants personally witnessed the abuses or contraband smuggling described in the amended complaint, the court cannot draw the inference from this evidence that moving defendants personally witnessed such acts when they observed the Road Squad. As defendants argue, the reasonable inference cuts the other way – that defendants A. Jackson and D. Jones would have attempted to hide the abuse and contraband smuggling when in the presence of supervisors.

To the extent plaintiffs argue that the evidence when viewed collectively permits the reasonable inference that moving defendants had prior knowledge of the Road Squad abuses, the court disagrees. Plaintiffs essentially ask the court to infer that moving defendants participated in a broad conspiracy to abuse plaintiffs based on evidence that shows only that contraband was smuggled into the Sampson C.I. through the Road Squad, some inmates got away with it, and that two moving defendants knew defendant A. Jackson possessed hot sauce on the bus and gave it to

---

[12]        As noted above, plaintiffs did not file plaintiff Cline's grievances in support of their opposition brief.

inmates at times. The court cannot draw a reasonable inference that moving defendants knew (or should have known) about the abuse alleged in the amended complaint based on this evidence.

In sum, plaintiffs have not forecasted sufficient evidence to establish that moving defendants knew or should have known about the constitutional violations alleged in the amended complaint. Accordingly, moving defendants are entitled to qualified immunity on plaintiffs' claims for bystander and supervisory liability, and the court grants defendants' motion for summary judgment as to these claims.

c.    Civil Conspiracy

Plaintiffs also assert a civil conspiracy claim pursuant to 42 U.S.C. § 1983 against defendants Murphy, Britt, Ward, and Sanchez. To establish a conspiracy claim under § 1983, plaintiffs "must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the plaintiffs'] deprivation of a constitutional right." Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 421 (4th Cir. 1996). "[M]ere allegations of conspiracy, backed up by no factual showing of participation in a conspiracy, are insufficient." Ballinger v. N.C. Agr. Extension Serv., 815 F.2d 1001, 1007 (4th Cir. 1987); see also Buschi v. Kirven, 775 F.2d 1240, 1248 (4th Cir. 1985).

This burden is a "weighty" one. Hinkle, 81 F.3d at 421. Plaintiffs "must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Id.; see also Hafner v. Brown, 983 F.2d 570, 576-77 (4th Cir. 1992). Thus, "to survive a properly supported summary judgment motion, [the plaintiffs'] evidence must, at least, reasonably lead to the inference that [defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." Hinkle, 81 F.3d at 421.

Plaintiffs cite to the following evidence in support of their civil conspiracy claim:

[Defendants] Britt and Murphy knew inmates were smoking on the bus and knew they had to be getting tobacco from somewhere. [All defendants knew about the hot sauce, and defendants Murphy, [K. Jones,] and Marks, knew what it was used for. [Defendants A. Jackson and D. Jones] openly carried their personal cell phones with them while out with the Road Squad. [Defendants A. Jackson and D. Jones] purchased food, drinks, and cigarettes at convenience stores for the inmates. [Defendant A. Jackson] claims to have reported instances of finding contraband while out with the Road Squad, but supervisors contend that they never knew. There was also a striking disparity in who found contraband during a search of the Road Squad bus or Road Squad inmates, despite plaintiffs' testimony that contraband was being smuggled daily.

(Pls' Am. Mem. (DE 203) at 16 (internal citations omitted)).

Plaintiffs' claim that defendant Murphy "knew" what the hot sauce was used for (with respect to abusing plaintiffs) is not supported by the deposition testimony cited.[13] (See Murphy Dep. (DE 202-16) at 13:1-19). Defendant Murphy testified he heard rumors that defendant A. Jackson used the hot sauce to abuse inmates only "after the fact" of the alleged abuse. (Murphy Dep. (DE 202-16) at 10:11-13). The remaining evidence shows only that inmates on the Road Squad smuggled contraband into the Sampson C.I. and that defendants A. Jackson and D. Jones carried their personal cellular telephones at work (in violation of DPS policy), but it does not provide circumstantial evidence that defendants Murphy, Britt, Ward, or Sanchez participated in a conspiracy to violate plaintiffs' constitutional rights.[14] See Hinkle, 81 F.3d at 422 (affirming grant of summary judgment on civil conspiracy claim where "[t]he problem with [the plaintiffs'] evidence is not merely that each alleged

---

[13]    The civil conspiracy claim is not alleged against defendants K. Jones or Marks, and thus it is not clear how the evidence allegedly showing they "knew" about the hot sauce is relevant to this claim.

[14]    Plaintiffs' argument that the evidence shows a "disparity" with respect to "who found contraband" also is not supported by the evidence cited. Defendant Hall testified that he found contraband on the Road Squad bus. (Hall Dep. (DE 202-6) at 58:9-59:1). Defendant Ward testified that he found more contraband in 2011 and 2012 than in other years, and that staff did not always properly document confiscation of contraband. (Ward Dep. (DE 202-22) at 20:10-17, 22:17-23:2). A. Jackson merely testified that some officers checked inmates more carefully than others. (See A. Jackson Dep. (DE 202-9) at 32:18-33:25). And plaintiffs' testimony that they were able to smuggle contraband into the prison on days when defendants Hall or Ward searched them does not without more establish circumstantial evidence that these defendants were involved in a conspiracy to smuggle contraband. (See Patten Dep. (DE 202-18) at 34:16-22, 43:14-19, 56:14-57:10; Parker Dep. (DE 202-17) at 60:14-17, 73:17-19, 109:23-110:21).

act is capable of an innocent interpretation. Rather, the problem is that [the plaintiffs'] evidence amounts to nothing more than rank speculation and conjecture. It does not reveal that any member of this alleged conspiracy possessed an intent to commit an unlawful objective."). Accordingly, the court grants moving defendants' motion as to the civil conspiracy claim.

        d.     Constructive Fraud

Under North Carolina law, there are two types of fraud: actual and constructive. <u>Watts v. Cumberland Cnty. Hosp. Sys.</u>, 317 N.C. 110, 115 (1986). "In order to maintain a claim for constructive fraud, plaintiffs must show that they and defendants were in a 'relation of trust and confidence . . . [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.'" <u>Barger v. McCoy Hillard & Parks</u>, 346 N.C. 650, 666 (1997) (citations omitted). "Implicit in the requirement that a defendant '[take] advantage of his position of trust to the hurt of plaintiff' is the notion that the defendant must seek his own advantage in the transaction; that is, the defendant must seek to benefit himself." <u>Id.</u> (citation omitted).

Plaintiffs forecast no evidence establishing the moving defendants sought to benefit themselves by the abuse and contraband smuggling operation alleged the amended complaint. As set forth above, the undisputed record evidence does not permit the reasonable inference that moving defendants were aware that defendants A. Jackson or D. Jones were involved in a contraband smuggling operation, much less participated in it or sought to benefit themselves through it. <u>See Forbis v. Neal</u>, 361 N.C. 519, 529 (2007) (presumption of fraud that arises from fiduciary relationship "may be rebutted by proof that no fraud was committed"). Indeed, as plaintiffs themselves testified, they did not pay any illicit profits from the operation to moving defendants.

(See Parker Dep. (DE 202-17) at 98:6-100:21; Jarman Dep. (DE 202-11) at 27:2-6). Plaintiffs offer no other testimony or evidence that moving defendants sought to benefit from the contraband smuggling operation. Accordingly, the court grants moving defendants' motion for summary judgment as to the constructive fraud claim.

e.      Intentional Infliction of Emotional Distress

Plaintiffs also bring a claim for intentional infliction of emotional distress against defendants Murphy, Britt, Ward, and Sanchez. Under North Carolina law, to establish a prima facie case for intentional infliction of emotional distress, a plaintiff must set forth sufficient evidence to establish: "1) extreme and outrageous conduct by the defendant; 2) which is intended to and does in fact cause; 3) severe emotional distress." Waddle v. Sparks, 331 N.C. 73, 82 (1992). "The law interferes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Waddle, 331 N.C. at 84. Conduct is "extreme and outrageous" if it "exceeds all bounds of decency tolerated by society" and is "regarded as atrocious, and utterly intolerable in a civilized community." Turner v. Thomas, 369 N.C. 419, 446 (2016) (internal quotations omitted). "Severe emotional distress" means any emotional or mental disorder, including neurosis, psychosis, chronic depression or phobia, that may be generally recognized and diagnosed by trained professionals. Holloway v. Wachovia Bank & Trust Co., 339 N.C. 338, 354–55 (1994).

Here, plaintiffs offer no evidence of extreme and outrageous conduct by defendants Murphy, Britt, Ward, or Sanchez. There is no evidence these defendants directly committed any acts of abuse or humiliation or otherwise had knowledge that the abuse was ongoing and failed to act.

Plaintiffs also have not offered any evidence that they experienced severe emotional distress. Plaintiff Dowless is the only plaintiff who testified that he sought psychological treatment for

"nightmares of the things that I witnessed and endured while I was on the road squad." (Dowless Dep. (DE 202-5) at 85:7-21). Plaintiff Dowless, however, does not explain how the "nightmares" constitute severe emotional distress. For example, there is no evidence documenting how often he experienced them or their severity. The solitary statement in his deposition that he sought treatment for "nightmares" is not sufficient to show plaintiff Dowless suffered from a mental disorder "generally recognized and diagnosed by trained professionals" as a result of the abuse. See Holloway, 339 N.C. at 355-56 (affirming grant of summary judgment on intentional infliction of emotional distress claim where plaintiff failed to offer evidence of "severe and disabling" emotional distress); see also Williams v. HomEq Servicing Corp., 184 N.C. App. 413, 419 (2007) (holding plaintiffs' testimony stating they suffered from chronic depression insufficient to establish severe emotional distress); Johnson v. Scott, 137 N.C. App. 534, 539 (2000) (holding summary judgment proper on negligent infliction of emotional distress claim where the only evidence of mental distress was plaintiffs' testimony that she suffered from nightmares and stress-related illness). The remaining plaintiffs do not offer any evidence they experienced severe emotional distress. The court therefore grants moving defendants' motion as to this claim.

B.    Motion for Sanctions

Plaintiffs move for sanctions against defendant Marks for his failure to comply with the court's December 7, 2017, and April 25, 2018, orders to provide discovery in this action. Plaintiffs seek severe discovery sanctions, including entry of default judgment, an order finding defendant Marks in contempt of court, an order instructing the jury to draw adverse inferences against defendant Marks, and prohibiting defendant Marks from introducing certain evidence at trial.

Under Rule 37 of the Federal Rules of Civil Procedure, "[i]f a party . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a)," a court may impose sanctions, including, but not limited to, "dismissing the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A); Hathcock v. Navistar Int'l Transp. Corp., 53 F.3d 36, 40 (4th Cir. 1995) ("[T]he express terms of Rule 37 permit a trial court to impose sanctions when 'a party fails to obey an order to provide or permit discovery.'"). Similarly, a court may impose sanctions, including dismissal, when a party refuses to serve answers, objections, or responses to written discovery, or fails to appear for a properly-noticed deposition. Fed. R. Civ. P. 37(d).

To warrant dismissal, the offending party's conduct in the litigation must demonstrate a "pattern of indifference and disrespect to the authority of the court." Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc., 872 F.2d 88, 93 (4th Cir. 1992); see also Wilson v. Volkswagen of Am., 561 F.2d 494, 499-516 (4th Cir. 1977). In determining whether dismissal is an appropriate sanction, courts consider the following four factors:

> (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions.

Mut. Fed. Sav. & Loan Ass'n, 872 F.2d at 92.

Nevertheless, before imposing a sanction of default judgment or dismissal, the court must "warn[] . . . in no uncertain terms . . . that failure to comply with the court's order [will] result in" such sanction. Anderson v. Found. for Advancement, Educ. & Employment of Am. Indians, 155 F.3d 500, 504 (4th Cir. 1998); see Hathcock, 53 F.3d at 40.

Here, the court has not warned defendant Marks that failure to comply with the court's discovery orders may result default judgment, and thus the court cannot impose that sanction. See

36

Anderson, 155 F.3d at 504; Hathcock, 53 F.3d at 40. The court also declines to impose the alternative sanctions requested by plaintiffs under the unique circumstances presented. Defendant Marks has submitted uncontradicted sworn testimony that he was suffering from serious health problems during the supplemental discovery period that prevented him from communicating appropriately with his counsel. (See Marks Aff. (DE 183-3)). Prior to the supplemental discovery period, defendant Marks participated in discovery, including by giving deposition testimony and producing some written discovery. (Resp. (DE 183) at 10). Under these unique circumstances, defendant Marks's failure to comply does not evidence bad faith.

Additionally, defendant Marks responded to the requested discovery approximately one month after the close of the supplemental discovery period. At plaintiffs' request, the court granted two requests for extension of time to respond to moving defendants' instant motion for summary judgment, which effectively gave plaintiffs four months to respond to the motion. This was ample time to review defendant Marks's belated discovery responses (which plaintiffs do not appear to contest were adequate). The court also would have considered plaintiffs' request to reopen discovery if necessary based on the supplemental responses, but no such motion was filed. Plaintiffs cannot credibly claim significant prejudice in these circumstances.[15] See Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003) (district courts should consider "amount of prejudice" caused by failure to comply with discovery order).

Furthermore, plaintiffs did not attempt to confer with defendant Marks' counsel prior to filing the instant second motion for sanctions. See Local Civ. R. 7.1(c) (requiring the parties to

---

[15] Plaintiffs were prejudiced to the extent they expended resources drafting the motion for sanctions and their reply brief. Plaintiffs, however, declined defendants' offer to pay their reasonable attorneys' fees and costs related to the motion. (Resp. (DE 183) at 7).

confer regarding discovery disputes prior to seeking court intervention).  The purpose of the supplemental discovery period was for the parties to work together in good faith to obtain the discovery necessary to prosecute this action.  Defendant Marks's counsel filed notice with the court on August 14, 2018, indicating that they had not been able to reach defendant Marks.  Plaintiffs' counsel did not contact defendant Marks's counsel in an attempt to informally resolve the issue, and instead moved for sanctions when defendant Marks failed to produce the discovery by the September 30, 2018, deadline.  (See Cassell Decl. (DE 183-8) ¶ 11).

Based on the foregoing, the court denies plaintiffs' second motion for sanctions.

C.      Motions to Seal

Moving defendants move to seal multiple filings related to the instant second motion for sanctions that contain highly personal, medical information concerning defendant Marks.  Plaintiffs do not object to sealing these records.  Plaintiffs also move to seal their reply in further support of the second motion for sanctions, with moving defendants' consent.  The public has received adequate notice of the motions to seal.  Regarding the documents the parties seek to seal in their entirety, no less drastic alternative to sealing is available because the private information appears throughout the filings sought to be sealed.  Defendant Marks's interest in preserving the confidentiality of his private health conditions outweighs any public interest in disclosure.  Accordingly, the court grants the motions to seal.

D.      Claims Remaining for Trial

Where plaintiffs' claims against pro se defendant D. Jones remain, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial.  Plaintiffs and defendant D. Jones are DIRECTED to file within 21 days from the date of this order

a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates.  In addition, the parties shall specify if they wish to schedule a period of time in advance of trial for conduct of court-hosted settlement conference or additional alternative dispute resolution procedures, and, if so, the date(s) for completion of such.

## CONCLUSION

Based on the foregoing, the court GRANTS moving defendants' motion for summary judgment (DE 189), DENIES plaintiffs' second motion for sanctions (DE 179), and GRANTS the parties' consent motions to seal (DE 184, 187).  The court DISMISSES plaintiffs' claims against defendants Hall, Marks, Jones, Outlaw, Burney, Holland, Murphy, Britt, Ward and Sanchez with prejudice.  The clerk is DIRECTED to maintain docket entries 186 and 183 under seal until further order of the court.  Plaintiffs and defendant D. Jones are DIRECTED to file status report regarding pretrial and trial activities as set forth herein within **21 days** of entry of this order.

SO ORDERED, this the 30th day of September, 2018.

_____
LOUISE W. FLANAGAN
United States District Judge